

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

August 18, 2025

**BY ECF**

The Honorable Laura Taylor Swain
Chief United States District Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007

    Re:    **United States v. Scott Becker,**
               **22 Cr. 231 (LTS)**

Dear Chief Judge Swain:

    The Government respectfully writes in advance of defendant Scott Becker's sentencing scheduled for September 3, 2025, at 11:00 a.m., to advise the Court of his extraordinary cooperation in connection with the successful prosecution of Sung Kook (Bill) Hwang and Patrick Halligan for one of the largest financial frauds in history. This letter describes Becker's substantial assistance in the investigation of wrongdoing at Archegos Capital Management, Hwang's investment business, and the trial of Hwang and Halligan, who was Archegos's Chief Financial Officer.

    As detailed below, Becker's testimony was a key component of the Government's case against Hwang and Halligan. As Archegos's director of risk management, Becker aided Hwang in his criminal scheme to manipulate the prices of certain securities and to balloon the size of the Archegos portfolio to more than $36 billion. From the early days of his cooperation, Becker was extremely forthcoming about his own misconduct and the ways in which he furthered Hwang's scheme. And unlike many others who remained loyal to Hwang, Becker made the courageous decision to break from Hwang and the Archegos enterprise, and to accept responsibility for his actions.

    In light of these facts, and assuming that Becker continues to comply with the terms of his cooperation agreement, commits no additional crimes, and appears for his sentencing as scheduled, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the U.S. Sentencing Guidelines (the "Guidelines" or "U.S.S.G."), for the Court to sentence Becker in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Guidelines.

**I.    Offense Conduct**

    Between 2020 and 2021, Hwang engaged in a criminal scheme to manipulate the prices of certain securities in the Archegos portfolio. Archegos was Hwang's family office—essentially, a

private hedge fund that did not take money from outside investors. Archegos had relationships with nearly a dozen counterparties or investment banks. These banks allowed Archegos to trade on margin, meaning that the banks effectively lent Archegos some of the funds with which it traded. Between 2020 and 2021, through manipulative trading and material misrepresentations to the counterparties, Hwang ballooned the size of the Archegos portfolio from less than $2 billion to more than $36 billion. Then, in March 2021, Hwang's scheme collapsed, causing more than $100 billion in apparent market value for nearly a dozen companies to disappear within a matter of days.

Becker served as the director of risk management at Archegos. He reported directly to Halligan, Archegos's CFO, and played an important role in Hwang and Halligan's criminal scheme. Becker was one of the primary contacts with Archegos's counterparties. At the direction of Halligan and Hwang, Becker routinely misrepresented to the counterparties the composition and riskiness of the Archegos portfolio so that the counterparties would continue to let Archegos trade. He also worked to assign to different counterparties the different trades that Hwang had directed, hunting for the best margin rates that would allow Hwang to continue buying larger quantities of certain securities. While Becker played a key role in Hwang's criminal scheme, it bears mentioning that Becker was not directly involved in Hwang's manipulative trading. Hwang separately handled this aspect of his crimes with William Tomita, his head trader, and the other traders at Archegos. Thus, Becker's role should be evaluated within the context that Hwang's criminal scheme consisted of both manipulating the market and lying to the counterparties, and Becker was largely focused on the latter aspect of the scheme.

Becker began working for Hwang and Halligan in October 2007, when he joined Hwang's then-hedge fund, Tiger Asia, as part of the operations group. There, he handled all accounting and tax-related work for the fund. In 2013, after Tiger Asia settled with the SEC and foreign regulators for market manipulation and insider trading conduct, Tiger Asia converted into a "family office," returned external funds, and was renamed as Archegos. Becker continued in a similar role following the conversion of Tiger Asia to Archegos.

As a family office, Archegos operated largely in the same manner as Tiger Asia had, except all the funds at the firm belonged to Hwang. As Becker testified, Hwang made all trading decisions at Archegos. He controlled all other aspects of the business as well, including things as small as where people would sit during meetings. (Trial Tr. 816:4-9). Hwang did not tolerate dissenting opinions at Archegos. Rather, loyalty was often discussed and valued at the firm. (Trial Tr. 826:2-3). Hwang also maintained a close hold on portfolio information at Archegos, much like he did at Tiger Asia. (Trial Tr. 816:10-12).

Beginning in 2020, at Hwang's direction, the frequency of trading at Archegos increased dramatically. Becker testified that Hwang was trading "[n]onstop. All day, every day." (Trial Tr. 832:2-4). Becker worked tirelessly to find the counterparty "with the best margin efficiency [] so the most leverage could be used for each trade," all to allow Hwang to do as much trading as possible. (Trial Tr. 834:9-14). The names that Hwang purchased also changed during this period. Where Hwang previously purchased "large cap U.S. names," like Amazon, he now switched to buying large quantities of American Depositary Receipts ("ADRs"), which are products that offer U.S. investors exposure to companies that trade on foreign exchanges. Hwang started purchasing huge quantities of ADRs in "less liquid" Chinese companies. (Trial Tr. 838:17-23). Becker

described 2020 into 2021 as extremely "hectic" and "busy." (Trial Tr. 832:10). He likened it to "Groundhog's Day," because his "workday was essentially the same over and over every day. Archegos was purchasing securities nonstop from the time the market opened to the time it closed." (Trial Tr. 889:7-14).

As the portfolio grew, Becker made misrepresentations to Archegos's counterparties regarding the composition, size, and riskiness of the Archegos portfolio. Becker told these falsehoods at the direction of Halligan. Halligan had first directed Becker to lie to the counterparties in 2017, when Becker was shadowing Halligan in anticipation of growing into the role of being the primary point of contact for many of the counterparties. Back then, Becker observed Halligan misrepresent the size of Archegos's largest position during phone calls with counterparties. When Becker questioned Halligan, Halligan told Becker that he should never "say that the largest position was any larger than 35 percent [of the overall portfolio], even if it was higher." (Trial. Tr. 893:25-894:2). Becker followed Halligan's direction, continuing to misrepresent the size of the largest position in the Archegos portfolio among other information. These misrepresentations continued until Archegos collapsed.

By March 2021, through Hwang's market manipulation scheme, and fueled by the misrepresentations to the banks, the Archegos portfolio grew to more than $36 billion and was extremely concentrated in just a few stocks. The portfolio became highly vulnerable to external events that might deflate the artificial prices Hwang's manipulative trading had created. Becker and Halligan were aware of, and discussed, this risk. Hwang was undeterred, however. He shared plans to grow the portfolio further by increasing the number of counterparties through which Archegos could trade. (GX 51B at 26).

The risks that Becker feared were realized in late March 2021. On March 22, ViacomCBS—one of the largest positions in the Archegos portfolio—announced a seasoned equity offering, which risked depressing the price of Viacom stock and unwinding Hwang's work. On March 23, to keep the price of Viacom artificially inflated, Hwang directed nearly a billion dollars in additional Viacom purchases, even as Halligan, Becker, and Tomita acknowledged that Archegos may not have the cash to cover the trading. When the day ended, Hwang understood that the following day the firm would face margin calls from its counterparties that it could not meet. The problems compounded on March 24, when the SEC announced new disclosure requirements that would apply to, and depress the stock prices of, some of the foreign issuers for which Archegos held ADRs. That day, using what cash and capacity remained, Hwang made one final attempt to reverse market forces through manipulative trading, but he failed. As he did so, Halligan and Becker strategized about how best to ignore and mislead that counterparties that were inquiring about the situation. When the markets closed, Archegos faced substantial margin calls that it could not meet.

During his testimony, Becker described the final days at Archegos in meticulous detail. On the evening of March 24, Hwang, Halligan, Tomita, Becker, and others strategized on a call about how to mislead the counterparties by falsely claiming that Archegos faced only a "liquidity" problem, not a "solvency" problem, and that its portfolio comprised stocks in "household names." Becker took detailed notes of the substance of the call. (GX 51B at 32). That night and the following morning, Archegos executives spoke with many of the counterparties, rehashing these lies and trying to buy more time. Becker joined for these calls and again took detailed notes. (GX

51B at 32-38). The following day, March 25, Halligan directed Becker to continue lying to the banks in a series of phone calls, many of which were automatically recorded by the banks. Becker did as Halligan directed, even sending Halligan a word document that summarized all the lies Becker had told to the counterparties that day. (GXs 186, 186-A).

These efforts were futile. By Friday, March 26, the counterparties lost patience and declared a default. In the following days, the counterparties sold the stocks they held in connection with their agreements with Archegos. The prices that had been artificially supported by the trading directed by Hwang, and funded by lies told by Becker and others, collapsed.

After the collapse of Archegos, Diana Pae, the President of Archegos, offered Becker a job at Grace & Mercy, Hwang's family philanthropic foundation. (Trial Tr. 1184:5-10). Despite Grace & Mercy being a non-profit organization, Pae offered Becker his same $250,000 salary plus a significant bonus. (Trial Tr. 1184:18-20). Becker spoke with Halligan about the offer and learned that the "job offer was only for" him, meaning if Becker refused the offer, the job would not be offered to anyone else. (Trial Tr. 1185:10-16). Becker refused the job offer, officially breaking ties with the Archegos enterprise. (Trial Tr. 1185:17-18).

## II. Procedural History

In late-March 2021, Archegos publicly collapsed. Within days of the collapse, the Government opened a criminal investigation into potential wrongdoing at Archegos.

On July 22, 2021, federal law enforcement agents executed a judicially authorized search warrant at Becker's residence, and seized his cellphone, computer, and certain hard copy documents. The next day, Becker met with the Government. Immediately following that meeting, Becker decided that he wanted to assist the Government. Becker began proffering with the Government on August 3, 2021.

Becker proffered with the Government several times in August 2021. He proffered again in December 2021 and April 2022. During these meetings, Becker provided credible and detailed information to the Government about his own crimes and those of his coconspirators, including Hwang and Halligan. On April 21, 2022, Becker pleaded guilty pursuant to a cooperation agreement with the Government. Becker pleaded guilty to a three-count Information that charged him with: (1) racketeering conspiracy, in violation of 18 U.S.C. § 1962(d); (2) securities fraud, in violation of 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2; and (3) wire fraud, in violation of 18 U.S.C. §§ 1343 and 2.

On April 25, 2022, a grand jury sitting in the Southern District of New York returned an eleven-count Indictment against Hwang and Halligan. Hwang was charged in all eleven counts with one count of racketeering conspiracy, two counts of securities fraud, seven counts of market manipulation, and one count of wire fraud. Halligan was charged in three counts with one count of racketeering conspiracy, one count of securities fraud, and one count of wire fraud. The charges against Hwang and Halligan were unsealed on April 27, 2022.

Subsequent to his guilty plea, Becker met with the Government more than 20 times and spent additional time outside of these meetings reviewing documents, emails, recordings, handwritten notebooks, and other records.

Becker testified at Hwang and Halligan's trial in May 2024. Becker was on the witness stand for more than one week, testifying over the course of five trial days. At the conclusion of trial, Hwang was convicted of one count of racketeering conspiracy, two counts of securities fraud, six of the seven counts of market manipulation, and one count of wire fraud. Halligan was found guilty of racketeering conspiracy, securities fraud, and wire fraud—all the counts with which he was charged.

### III. The Presentence Investigation Report and the Applicable Guidelines Range

The U.S. Probation Office issued a final Presentence Investigation Report on August 13, 2025. In the PSR, the Probation Office calculates the otherwise applicable Guidelines sentence to be 188 to 235 months' imprisonment, based on an offense level of 36 and a criminal history category of I. (PSR ¶ 178). The calculations of the Probation Office are set forth in paragraphs 112 through 125 of the PSR. The offense level is driven principally by the loss amount of over $9 billion, which, under U.S.S.G. § 2B1.1(b)(1)(P), results in a 30-level increase to the offense level. (PSR ¶ 115). Notwithstanding the Guidelines calculation, the Probation Office recommends a below-Guidelines sentence of time served. (PSR at 50).

### IV. Forfeiture and Restitution

The Government intends to seek forfeiture and restitution from Becker. Prior to sentencing, the Government will submit proposed forfeiture and restitution orders to the Court.

### V. Cooperation and Significance of Assistance

Under Section 5K1.1(a) of the Guidelines, the appropriate reduction in a defendant's sentence for his cooperation should be determined based on, among other things, "the significance and usefulness of the defendant's assistance," the "truthfulness, completeness, and reliability" of his information, the "nature and extent" of his cooperation, and the "timeliness of the defendant's assistance." By the measure of each factor set forth in Section 5K1.1(a), Becker's assistance was not only substantial, but extraordinary.

#### A. Timeliness of Becker's Assistance (5K1.1(a)(5))

Becker's cooperation was very timely. Although he did not self-report the wrongdoing at Archegos, he came clean immediately after he became aware of the Government's investigation via a search of his residence, and prior to being charged. Becker thereafter met with the Government repeatedly in short succession in August 2021. These meetings were important to allow the Government to quickly gather information about the wrongdoing at Archegos. Based on the information that Becker provided, the Government was able to swiftly execute a search warrant at the premises of coconspirator Will Tomita in September 2021. Tomita became another cooperating witness for the Government, and his case is also pending before this Court. The timeliness of Becker's cooperation further contributed to the speed with which the Government

was able to indict Hwang and Halligan, bringing charges in a complicated and massive fraud scheme just over one year after Archegos collapsed.

### B. Significance and Usefulness of Becker's Assistance (5K1.1(a)(1))

Becker's cooperation was extremely valuable to indict and convict Hwang and Halligan, to understand the means and methods of the Archegos enterprise, and to piece together the timeline of the fraud scheme. As a member of the racketeering enterprise, Becker gave the jury an inside look at how Archegos operated. He explained the culture of loyalty and deep devotion to Hwang, which animated the day-to-day decisions of people at Archegos.

At trial, Halligan's primary defense was that he was not involved in the market manipulation, and that he was unaware that Archegos was lying to the banks. On the second point, Halligan argued that it was Becker, and not he, who was lying to the counterparties. Becker's testimony provided a complete and direct response to this argument. Becker explained that it was Halligan who had initially directed him to lie by never telling a counterparty that the fund's largest position exceeded 35 percent of the overall portfolio, and that thereafter Becker continued lying at Halligan's direction. Here, Becker was particularly useful in explaining certain Bloomberg messages with Halligan, which proved that Halligan was in on the fraud.

As for Hwang, one of his many attempted defenses was that his trading strategy remained largely consistent over time. Hwang claimed, among other things, that he always took large, concentrated positions in certain securities, and always held the so-called "FAANG" stocks, like Facebook, Apple, Amazon, and others. Here too Becker provided an extremely useful response to these claims, because Becker explained that the trading at Archegos changed dramatically once Hwang started his scheme. Gone were the slow days of trading here or there; starting in 2020 and continuing into 2021, Hwang was trading every minute of every day, and Becker was working furiously to find a counterparty at which to park those trades.

Becker's testimony was also particularly useful given the complicated nature of this case, which involved a massive scheme by Hwang to inflate the prices of securities, thereby growing his portfolio by billions of dollars. The means by which he did this was complicated. Becker, however, was able to explain the complicated finance concepts to the jury in a down-to-earth manner. In doing this, he helped the jury understand the issues and ultimately convict Hwang and Halligan of their crimes.

In addition to the criminal cases against Hwang and Halligan, Becker provided assistance to the SEC and CFTC in their parallel investigations. During proffer sessions, Becker was interviewed by federal agents, AUSAs, and representatives from the SEC and CFTC. He later settled with both the SEC and CFTC. Then, based on information Becker provided, the SEC and CFTC filed civil complaints against Archegos, Hwang and Halligan.

### C. Truthfulness, Completeness, and Reliability of Information and Testimony (5K1.1(a)(2))

Becker was incredibly candid with the Government about his crimes. He accepted full responsibility from his very first proffer, and did not minimize or shift blame.

Becker's testimony was credible for its consistency, his earnest demeanor on the stand, and his genuine remorse for his actions. But it was also corroborated by emails, Bloomberg chats, handwritten notebooks that he maintained during his time at Archegos, and the testimony of other witnesses.

For instance, Bloomberg messages and emails from the time of the fraud showed that Halligan was aware of and approved of Becker continuing to mislead the counterparties, including through a series of lies that Becker told to UBS about the liquidity of the portfolio in February and March 2021. (*See, e.g.*, GXs 3750, 3725). Likewise, Becker's contemporaneous notebooks from the time of the fraud, including during the final week before the collapse, reflected misstatements that Archegos made to counterparties. (*See* GX 51B). And while Becker typically made his misrepresentations to the counterparties during phone calls that Halligan did not join, Halligan joined for at least one call with Bank of America on March 16, 2021. During that call, Becker or Halligan misrepresented the size of the largest position in the Archegos portfolio. The Bank of America representative took notes of the call, and the Government offered them into evidence at trial. (GX 2351). Those notes corroborated Becker's testimony that the directive to mislead the counterparties came from Halligan and directly refuted Halligan's claim that he was unaware of Becker's lies.

### D.  Nature and Extent of Becker's Assistance (5K1.1(a)(3))

Becker's cooperation was extensive. He met with the Government repeatedly in August 2021, and again in December 2021 and April 2022, providing critical information that allowed the Government to indict Hwang and Halligan swiftly. Then, between November 2023 and May 2024, Becker met with the Government on more than 20 occasions to prepare for his trial testimony. These meetings with the Government often lasted for several hours at a time, starting early in the morning and continuing until late afternoon. During these meetings, Becker reviewed and explained to the Government dozens of audio recordings, emails, Bloomberg chats, and handwritten pages from his notebooks. He recounted conversations with Hwang and Halligan, some from many years ago, and many which the Government elicited during his trial testimony.

In addition to the many hours that Becker spent with the Government reviewing these materials, Becker also spent a significant amount of time on his own preparing for these meetings. Becker reviewed hundreds, if not thousands, of pages of Bloomberg chats. He also reviewed his handwritten notebooks. The Government relied upon that work in preparing Becker's testimony. By these actions, Becker demonstrated that he was taking the work of a cooperating witness seriously, and that he was committed to doing all that he could to best assist the Government in its prosecution of Hwang and Halligan.

But it was Becker's trial testimony that exemplifies the extensive nature of his cooperation. Becker began his testimony on a Monday morning, remained on the witness stand all week, including over the Memorial Day, four-day weekend, and then resumed his testimony the following Tuesday. He was subject to two-and-half days of direct examination, and then an equal amount of cross-examination by two relentless defense attorneys. The cross examinations in this case were particularly trying. He was personally attacked and repeatedly confronted with the

allegation that he was fabricating his testimony against Halligan based on his purported deep-seated hatred for Halligan. Yet Becker kept his composure throughout his time on the witness stand. He answered all the defense attorney's questions to best of his recollection, conceding a point when appropriate and pushing back when not. He did not stretch or reach with his testimony, instead giving the jury an accurate depiction of his crimes, and the crimes of others, at Archegos.

### E. Any Injury Suffered or Any Danger or Risk of Injury to Becker or His Family Resulting from His Assistance (5K1.1(a)(4))

Becker testified at great personal and professional cost. He broke ties with the Archegos enterprise and with Hwang and Halligan, both of whom had been his bosses for more than a decade. Professionally, he admitted to such serious wrongdoing that he effectively prevented himself from ever securing a position in finance or accounting again.

In considering Becker's decision to assist the Government, the degree to which Hwang exercised cult-like control over Archegos employees cannot be overstated. As Becker explained during his testimony, there was a culture of loyalty to Hwang at Archegos. Dissenting opinions were not tolerated. This culture bred a deep-seated fear of what might happen to employees if they disobeyed Hwang. This culture of loyalty explains why so many other Archegos employees refused to testify truthfully about Hwang and Halligan's wrongdoing at Archegos. Becker, however, broke with this culture and risked serious personal and professional consequences when he decided to assist the Government, plead guilty, and testify at trial against Hwang and Halligan.

Notably, Becker made his choice to break from Archegos immediately after Archegos collapsed, and before the Government approached him in July 2021. Like other loyal Archegos employees, following the collapse of Archegos, Becker was offered a lucrative position at Grace & Mercy, Hwang's foundation. But Becker refused that offer, making the choice to cut ties with Hwang and Halligan and begin a law-abiding life. And since then, Becker has transformed his life. He has left behind the world of finance and accounting and is instead pursuing a career in personal training, thus significantly reducing any chance of recidivism. (PSR ¶ 157).

## VI.  Conclusion

As set forth above, the Government believes that Becker provided substantial assistance to the Government. Accordingly, as discussed, assuming Becker continues to comply with the terms of his cooperation agreement, the Government intends to request at sentencing that the Court sentence Becker in light of the factors set forth in Section 5K1.1(a) of the Guidelines.

Respectfully submitted,

JAY CLAYTON
United States Attorney

By: *Alexandra Rothman*
Alexandra N. Rothman
Samuel P. Rothschild
Andrew Thomas
Assistant United States Attorneys

cc: Jason Brown, Esq. (by ECF)